# ASSET PURCHASE AGREEMENT

dated as of January 26, 2000

between

SURGICAL SENSE, INC.

(a Texas corporation)

and

BARD ASDI, INC.

(a New Jersey corporation)

TABLE OF CONTENTS


Page

1. PURCHASE AND SALE OF ASSETS ..... 1
1.1 Description of Assets ..... 1
1.2 Retained Assets ..... 3
1.3 Purchase Price ..... 4
1.4 Assumption of Certain Liabilities ..... 5
1.5 Retained Liabilities ..... 6
1.6 Transfer of Assets ..... 7
1.7 Power of Attorney ..... 7
1.8 Non-Assignable Assets ..... 7
1.9 Allocation of Purchase Price ..... 8
2. CLOSING ..... 8
2.1 Place and Time of Closing ..... 8
2.2 Delivery of Documents; Payment of Purchase Price ..... 8
3. REPRESENTATIONS AND WARRANTIES OF THE SELLER ..... 8
3.1 Due Organization ..... 8
3.2 Authorization; Validity of Obligations ..... 9
3.3 Capitalization of the Seller ..... 9
3.4 Subsidiaries ..... 9
3.5 No Conflicts ..... 9
3.6 Government Approval ..... 10
3.7 Financial Statements ..... 10
3.8 Liabilities and Obligations ..... 11
3.9 No Adverse Change ..... 11
3.10 Permits and Licenses ..... 12
3.11 Personal Property ..... 12
3.12 Material Contracts and Commitments ..... 13
3.13 Real Property ..... 13
3.14 Insurance ..... 13
3.15 Compensation; Employment Agreements; Organized Labor Matters ..... 13
3.16 Employee Benefit Plans ..... 14
3.17 Conformity with Law; Litigation ..... 14
3.18 Taxes ..... 14
3.19 No Violations; No Consents Required ..... 14
3.20 Sufficiency of Assets ..... 14
3.21 Intellectual Property ..... 15
3.22 Accounts Receivable ..... 16
3.23 Inventory ..... 17
3.24 Environmental Warranties ..... 17
3.25 Year 2000 Compliance ..... 18
3.26 Undisclosed Liabilities ..... 19
3.27 Accuracy of Information ..... 19
4. REPRESENTATIONS OF THE BUYER ..... 19
4.1 Due Organization ..... 19

4.2 Authorization, Validity of Obligations .......... 19
4.3 No Violations .......... 19
5. COVENANTS PRIOR TO CLOSING .......... 20
5.1 Access and Cooperation; Due Diligence .......... 20
5.2 Conduct of Business Pending Closing .......... 20
5.3 Prohibited Activities .......... 20
5.4 Consultation .......... 22
5.5 Notification of Certain Matters .......... 22
5.6 Notice of Change of Scheduled Information .......... 22
5.7 Product Liability Insurance .......... 22
5.8 Atrium Inventory .......... 23
5.9 Further Assurances .......... 23
6. CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLER. .......... 23
6.1 Representations and Warranties; Performance of Obligations .......... 23
6.2 Opinion of Counsel .......... 23
6.3 Consents and Approvals; No Restraint .......... 23
6.4 Buyer's Incumbency Certificate .......... 23
6.5 Buyer's Authorizing Resolution .......... 24
6.6 Inman Agreement .......... 24
6.7 Biggers Agreement .......... 24
6.8 Assumption Agreement .......... 24
6.9 Employment Agreements .......... 24
6.10 Other Offers of Employment .......... 24
6.11 Escrow Agreement .......... 24
7. CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER .......... 24
7.1 Representations and Warranties; Performance of Obligations .......... 24
7.2 No Material Adverse Effect .......... 24
7.3 Opinion of Counsel .......... 25
7.4 Consents and Approvals; No Restraint .......... 25
7.5 Instruments of Conveyance .......... 25
7.6 Seller's Incumbency Certificate .......... 25
7.7 Seller's Authorizing Resolutions .......... 25
7.8 Inman Agreement .......... 25
7.9 Biggers Agreement .......... 25
7.10 Employment Agreements .......... 25
7.11 Agreements Relating to Trade Secrets and Confidential Information .......... 25
7.12 Amended and Restated Agreement .......... 25
7.13 Termination of Consulting Agreement .......... 25
7.14 Dr. Reddick Agreement .......... 26
7.15 Dr. Kugel Agreement .......... 26
7.16 Trademark Assignment .......... 26
7.17 Patent Assignments .......... 26
7.18 Domain Name Assignments .......... 26
7.19 Escrow Agreement .......... 26
7.20 Change of Name .......... 26

7.21 Payment of Debt ..... 26
7.22 Manufacturing and Supply Agreements..... 26
7.23 Continuing Relationship ..... 26
8. POST-CLOSING COVENANTS ..... 26
8.1 Further Assurances ..... 26
8.2 Employment Matters..... 27
8.3 Retention of Purchase Price..... 27
9. INDEMNIFICATION..... 27
9.1 Survival of Representations and Warranties of the Seller ..... 27
9.2 Indemnification by the Seller..... 28
9.3 Indemnification by the Buyer..... 28
9.4 Third Person Claims..... 29
9.5 Escrow; Buyer's Right of Set-Off..... 29
9.6 Arbitration. ..... 29
9.7 Limitations on Indemnification..... 30
9.8 Method of Payment..... 31
10. TERMINATION OF AGREEMENT ..... 31
10.1 Termination ..... 31
10.2 Liabilities in Event of Termination ..... 31
11. NONCOMPETITION ..... 31
11.1 Prohibited Activities ..... 31
11.2 Equitable Relief..... 32
11.3 Reasonable Restraint..... 32
11.4 Severability; Reformation..... 32
12. NONDISCLOSURE OF CONFIDENTIAL INFORMATION ..... 33
12.1 General..... 33
12.2 Equitable Relief..... 33
12.3 Survival ..... 33
13. GENERAL..... 34
13.1 Bulk Sale Laws ..... 34
13.2 Cooperation..... 34
13.3 Successors and Assigns..... 34
13.4 Entire Agreement..... 34
13.5 Counterparts ..... 34
13.6 Brokers and Agents..... 34
13.7 Expenses..... 34
13.8 Notices ..... 34
13.9 Governing Law..... 36
13.10 Survival of Representations and Warranties..... 36
13.11 Exercise of Rights and Remedies..... 36
13.12 Reformation and Severability..... 36
13.13 Remedies Cumulative ..... 36
13.14 Captions ..... 36
13.15 Employees of Seller..... 36
13.16 Knowledge Imputed to the Seller..... 36

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is made as of January 26, 2000 between SURGICAL SENSE, INC., a Texas corporation (the "Seller") and BARD ASDI, INC., a New Jersey corporation (the "Buyer").

**WHEREAS,** the Seller is engaged in the business of designing, manufacturing, marketing and selling of hernia repair products (the "Business") and is also engaged in businesses unrelated to the Business as more particularly described on Schedule 1.0 (the "Excluded Business"); and

**WHEREAS,** the Buyer desires to purchase from the Seller, and the Seller desires to sell to the Buyer substantially all of the assets, properties and rights of the Seller as a going concern, subject only to the assumption by the Buyer of certain specified liabilities of the Seller, all as more particularly described herein.

**NOW, THEREFORE,** in consideration of the premises and of the mutual agreements, representations, warranties, provisions and covenants herein contained, the parties hereto hereby agree as follows:

## 1. PURCHASE AND SALE OF ASSETS

1.1 Description of Assets. The Seller hereby agrees to sell to the Buyer, and the Buyer hereby agrees to purchase from the Seller, at the Closing (as such term is defined in Section 2.1 hereof), subject to and upon the terms and conditions contained herein, all of the right, title and interest of the Seller in and to all assets, properties and rights of the Seller, of every nature, kind and description, wherever located, tangible and intangible, real, personal and mixed, used or anticipated for use in connection with the Business, excluding only those assets as specified in Section 1.2 hereof, as the same shall exist on and as of the Closing Date (collectively, the "Assets"), including, without limitation, the following:

(i) all right, title and interest of the Seller in and to the Business as a going concern, the Seller's goodwill, its name and any derivatives or combinations thereof and all other intangible assets;

(ii) all rights of the Seller to all intellectual property relating to the Business including, without limitation, all trade secrets, know-how, patents, (including, without limitation, all substitutions, reissues, extensions, re-examinations, re-registrations, renewals, supplementary protection certificates, and inventors' certificates), and all patent applications (including divisionals, continuations, and continuations-in-part), inventions, whether or not patentable and whether or not reduced to writing, licenses, license rights, trademarks (including service marks, tradenames and logos), trademark applications, copyrights, copyright registrations, domain names, websites, software, computer programs, prototypes, designs, discoveries, techniques, methods, ideas, concepts, engineering and manufacturing

information, mask works, quality control information, procedures, specifications, diagrams, schematics, blueprints, parts lists, procurement terms, data (including, without limitation, analytical, pre-clinical and clinical data and reports), marketing concepts, distribution and consumer information, research and development data, and regulatory filings, whether owned or licensed by the Seller, including without limitation the Owned Intellectual Property and the Licensed Intellectual Property (collectively, "Intellectual Property"). "Owned Intellectual Property" comprises the patents, patent applications, trademarks, trademark applications, copyright registrations, domain name registrations and registered maskworks used or anticipated for use in connection with the Business, all of which are set forth on Schedule 1.1(a). "Licensed Intellectual Property" comprises the Intellectual Property that Seller has licensed from a third party and that is used or anticipated for use in connection with the Business, all of which is set forth on Schedule 1.1(b).

(iii) all of the Seller's accounts receivable and inventory of hernia repair products and related supplies and materials, including, without limitation, rights to any work in process;

(iv) all rights of the Seller as of the date of and immediately prior to the Closing under all permits, licenses, authorizations, approvals, consents, franchises and any pending application or the like relating to any of the foregoing that are necessary for, or otherwise relate to, the Seller's operation or anticipated operation of the Business;

(v) all rights of the Seller as of the date of the Closing under the Assumed Agreements as such term is defined in Section 1.4;

(vi) all marketing and sales literature that is used by the Seller in the Business;

(vii) all rights and interests under or pursuant to all warranties and guarantees made to the Seller that relate to the Business (except to the extent such rights and interests relate solely to Retained Assets or Retained Liabilities);

(viii) all prepaid and similar items, including, without limitation, all prepaid expenses, rebates and discounts from vendors and advance payments (except to the extent that such items relate solely to Retained Assets or Retained Liabilities);

(ix) any and all claims (including, without limitation, counterclaims, cross claims and other claims in the nature of indemnification or contribution and claims of infringement against third parties), rights and choses in action against other persons or entities to the extent related to (a) the Business, (b) any Assets or (c) Assumed Liabilities (except to the extent such claims, rights or choses in action relate solely to Retained Assets or Retained Liabilities, including without limitation claims and rights of Seller under confidentiality or non-disclosure agreements with third parties to whom Seller provided information with respect to the Business);

(x) all personal property, including, without limitation, equipment, furniture, office equipment and supplies, vehicles, computer hardware and communications equipment;

(xi) all computer software used by Seller that has application to the Business, whether owned outright or under a license or other agreement;

(xii) all of Seller's training materials, including, without limitation, training videos and prosthetic training devices; and

(xiii) all corporate and business records related to the Business in whatever form ("Business Records"), including, without limitation, sales records, invoices, credit records, purchasing materials and records, personnel and payroll records, manufacturing, maintenance and quality control records and procedures, warranty and service records, accounting records, inventory records, accounts receivable and accounts payable records and files, and litigation files (excluding only those Business Records related solely to Retained Assets or Retained Liabilities), supplier lists and records, price lists and any lists, databases or other compilations of prospects or customers; provided, that the Seller may retain copies of sales and marketing information to doctors and hospitals for use solely in connection with the Excluded Business and such other activities as Buyer may approve in writing (which approval will not be unreasonably withheld, it being understood that such approval will not be deemed to have been unreasonably withheld if the proposed activity of the Seller is an activity in which Buyer or any of its affiliates is at the time of such request engaged or plans to engage), provided that (i) nothing contained herein shall limit the non-compete obligations imposed on any third party under any agreement required to be executed and delivered to the Buyer pursuant to this Agreement and (ii) under no circumstances and at no time may Seller use such sales and marketing information in connection with any hernia repair business. The Business Records shall be maintained in existence by Buyer until the later of seven years following the Closing Date or such longer period as may be required in accordance with law or court order applicable to the Buyer. After the Closing and prior to their destruction, the Business Records shall be made available for inspection and duplication by Seller, at its expense, upon reasonable notice during normal business hours, to the extent that such access may be reasonably required (i) to facilitate the investigation, litigation and final disposition of any claims that may be made against the Seller or (ii) in connection with the preparation of tax returns and audits.

1.2 <u>Retained Assets</u>. Notwithstanding anything in this Agreement to the contrary, the following assets of the Seller (the "Retained Assets") shall be excluded from the Assets to be sold by the Seller to the Buyer hereunder: Seller's minute books, stock record books, tax records and such other books and records as pertain to the organization, existence or ownership of Seller (the "Retained Records") and the assets identified on <u>Schedule 1.2</u>. The Retained Records shall be maintained in existence until the later of seven years following the Closing Date or such longer period as may be required in accordance with law or court order applicable to the Seller. After the expiration of the foregoing period and prior to the destruction of any Retained Records,

Seller shall notify the Buyer in writing of its intention to destroy such records and turn over to the Buyer any of such Retained Records that the Buyer designates in writing to the Seller within 60 days after the receipt by the Buyer of such notice from the Seller. After the Closing and prior to their destruction, the Retained Records shall be made available for inspection and duplication by Buyer, at its expense, upon reasonable notice during normal business hours.

1.3 Purchase Price. The total purchase price (the "Purchase Price") which the Buyer shall pay for the Assets and in consideration of the covenants of the Seller contained in Section 11 is $26,000,000, to be increased by the Positive Adjustment Amount or decreased by the Negative Adjustment Amount as hereinafter provided. The Purchase Price shall be payable at the Closing in cash by wire transfer of immediately available funds to an account designated by Seller, less the amount of $2,600,000 (the "Holdback Amount"), which shall be delivered to the escrow agent referred to in the Agreement referred to in Section 7.19 hereof by wire transfer or by bank cashier's check. The Purchase Price shall be (i) increased by the amount by which the Net Book Value of the Business on the Closing Date exceeds the Net Book Value of the Business on June 30, 1999 (the "Positive Adjustment Amount"); or (ii) decreased by the amount by which the Net Book Value of the Business on the Closing Date is less than the Net Book Value of the Business on June 30, 1999 (the "Negative Adjustment Amount"). The "Net Book Value" means the total book value of the Assets minus the Assumed Liabilities (which in the case of the determination of the Assumed Liabilities included in the Net Book Value of the Business on June 30, 1999 shall mean the amount at June 30, 1999 of the type of liabilities included within the Assumed Liabilities to be assumed on the Closing Date but shall include the accruals at June 30, 1999 for the liabilities of Seller for contributions to its 401(k) plan and for payroll, bonus and commissions). The Seller and the Buyer agree that the Net Book Value of the Business at June 30, 1999 is set forth on Schedule 1.3. Within 60 days following the Closing, the Buyer shall cause a balance sheet to be prepared reflecting the Assets and Assumed Liabilities on the Closing Date (the "Closing Date Balance Sheet"), certified by its chief financial officer as having been prepared in accordance with generally accepted accounting principles, applied consistently with the preparation of Schedule 1.3. The Net Book Value of the Business as reflected on the Closing Date Balance Sheet shall not include any Atrium Inventory (as herein defined) to the extent such Atrium Inventory is not fully paid for as of the Closing Date. The value of the inventory received from Prodesco, Inc. included in the Closing Date Balance Sheet shall not be reduced by reason of any claim of lack of biocompatibility or equivalency nor shall the value of any such inventory or the value of any Atrium Inventory be reduced solely by reason of any determination by Buyer not to sell any such inventory if such inventory would be saleable in the ordinary course of business. Based upon such balance sheet, the Buyer shall deliver to the Seller a computation of the Net Book Value of the Business on the Closing Date prepared in a manner consistent with the preparation of Schedule 1.3 and presented in the same detail as Schedule 1.3. In the event that the Seller shall disagree with the Buyer's determination of the Net Book Value of the Business on the Closing Date, the Seller shall notify the Buyer of the matters with which it disagrees within 30 days of the Seller's receipt thereof and the parties hereto shall use their best efforts to promptly resolve any differences. The Buyer shall make available to the Seller all information and data relating to the preparation of the Net Book Value of the Business on the Closing Date as the Seller may reasonably request. If the parties are unable to resolve any disagreements that they may have with respect to the Net Book Value of the Business on the Closing Date within 30 days following the Seller's giving of notice

its disagreement to the Buyer then the Seller or the Buyer shall submit a demand for arbitration in accordance with Section 9.6 hereof.

Any Positive Adjustment Amount shall be paid promptly to the Seller. Any Negative Adjustment Amount shall be paid promptly to the Buyer.

The following provisions shall be applicable in respect of the Holdback Amount.

(i) In the event Buyer asserts a claim for indemnification against Seller pursuant to Section 9 of this Agreement on or before the first anniversary of the Closing Date and such claim is resolved, before or after such first anniversary date, pursuant to an agreement between Buyer and Seller or a judgement of a court of competent jurisdiction or an arbitrator's award pursuant to Section 9.6 hereof, Buyer and Seller shall jointly instruct the Escrow Agent to pay to Buyer any amount payable by Seller to Buyer in respect of such claim from the Holdback Amount.

(ii) On the first anniversary of the Closing Date, Buyer and Seller shall jointly instruct the Escrow Agent to release the balance of the Holdback Amount, plus any interest earned thereon, to Seller, unless prior to the first anniversary of the Closing Date, Buyer shall have made a claim for indemnification under Section 9 this Agreement, in which case on the first anniversary of the Closing Date Buyer and Seller shall jointly instruct the Escrow Agent to release to Seller the amount of the Holdback Amount (plus any interest earned thereon) less an amount equal to the maximum amount of any claims made by Buyer not previously resolved, which Buyer and Seller shall instruct the Escrow Agent to release only upon and in accordance with the resolution of such claims pursuant to an agreement between Buyer and Seller or a judgement of a court of competent jurisdiction or an arbitrator's award pursuant to Section 9.6 hereof.

1.4 Assumption of Certain Liabilities. The Buyer hereby agrees that at the Closing, subject to and upon the terms and conditions contained herein, it shall assume and agree to satisfy and perform when due the following specified obligations and liabilities of the Seller (the "Assumed Liabilities"), but no others:

(i) all obligations and liabilities of the Seller to be performed after the Closing under the contracts and purchase orders listed on and attached to Schedule 1.4 and the obligation of Seller to deliver products to customers submitting orders prior to the Closing in the ordinary course of business (the "Assumed Agreements"); provided, however, that, the Buyer is not assuming any obligations or liabilities for any breach or default under any Assumed Agreement outstanding at the time of Closing or resulting from any claim, legal or equitable action, proceeding or investigation pertaining or relating to or arising from circumstances, events, conditions, acts or omissions occurring or existing on or prior to the Closing Date;

(ii) all obligations and liabilities of the Seller in respect of current liabilities pertaining to the Business (including, without limitation, current accounts payable, payment obligations for work in process, current trade obligations and royalties payable (but expressly excluding indebtedness to Joel Douglas Inman or any other person or entity for borrowed money and expressly excluding any obligations to Dr. William Saye) to the extent that such current liabilities (a) are accrued on Schedule 1.3 or (b) were incurred by the Seller after the Balance Sheet Date and prior to the Closing Date (as such term is defined in Section 2.1 hereof) in the ordinary course of business consistent with past practice and are reflected on the Closing Date Balance Sheet;

(iii) all obligations and liabilities of the Seller pertaining to the Business to satisfy warranty claims, return requests and customer refunds to the extent that such claims were incurred by the Seller in the ordinary course of business consistent with past practice and do not exceed $200,000 in the aggregate;

(iv) all obligations and liabilities of the Seller pertaining to the Business in respect of sales, use and excise taxes to the extent that such taxes (a) are accrued on Schedule 1.3 or (b) were incurred by the Seller after the Balance Sheet Date and prior to the Closing Date in the ordinary course of business consistent with past practice and are reflected on the Closing Date Balance Sheet.

The Buyer is not assuming, and shall not be deemed to have assumed, any obligations or liabilities of the Seller other than the Assumed Liabilities specifically described above.

1.5 Retained Liabilities. Notwithstanding anything in this Agreement to the contrary, the Buyer is not assuming and will not perform, any obligations or liabilities not specifically described in Section 1.4 hereof or any of the following obligations and liabilities (the "Retained Liabilities):

(i) any obligation or liability of the Seller for or in respect of any indebtedness for borrowed money including obligations to Joel Douglas Inman; or

(ii) any obligation or liability of the Seller resulting from any claim, legal or equitable action, proceeding or investigation pertaining or relating to or arising from circumstances, events, conditions, acts or omissions occurring or existing on or prior to the Closing Date; or

(iii) any obligation or liability of the Seller incurred in connection with the making or performance of this Agreement including, without limitation, legal, accounting, brokerage or finder's fees relating to the sale of the Assets to the Buyer; or

(iv) any obligation or liability of the Seller to Dr. William Saye; or

(v) any obligation of the Seller relating to any payroll, bonus or commission obligations or employee benefit plan of the Seller; or

(vi) any obligation of the Seller with respect to any contract or agreement listed on Schedule 3.12 except to the extent such contract or agreement is listed on Schedule1.4; or

(vii) any obligation of the Seller under any contract or understanding with or purchase order issued to any person or entity listed on Schedule 1.5, except to the extent otherwise specifically provided in Schedule1.4.

1.6 Transfer of Assets. The transfer of the Assets as herein contemplated shall be made by the Seller, free and clear of all liens, claims, liabilities, obligations and encumbrances of any kind or nature except only those assumed by the Buyer pursuant to Section 1.4 hereof and shall be effected by such bills of sale, endorsements, assignments, drafts, checks and other instruments of transfer and assignment as shall be necessary or appropriate to transfer and assign the Assets to the Buyer on the Closing Date as contemplated by this Agreement and as shall be reasonably requested by the Buyer. The Seller shall, at any time and from time to time after the Closing Date, execute and deliver such other instruments of transfer and do all such further acts and things as may reasonably be requested by the Buyer to transfer, assign and deliver to the Buyer or to aid and assist the Buyer in collecting and reducing to possession, any and all of the Assets, or to vest in the Buyer good, valid and marketable title to the Assets.

1.7 Power of Attorney. Effective upon the Closing Date, the Seller hereby irrevocably constitutes and appoints the Buyer, its successors and assigns, the true and lawful attorney of the Seller with full power of substitution, in the name of the Buyer, or the Seller, on behalf of and for the benefit of the Buyer, to collect all accounts receivable and other items being transferred and assigned to the Buyer as provided herein, to endorse, without recourse, checks, notes and other instruments in the name of the Seller, to institute and prosecute, in the name of the Seller or otherwise, all proceedings which the Buyer may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to the Assets, to defend and compromise any and all actions, suits or proceedings in respect of any of the Assets, and to do all such acts and things in relation thereto as the Buyer may deem advisable. The Seller agrees that the foregoing powers are coupled with an interest and shall be irrevocable by the Seller directly or indirectly by the dissolution of the Seller or in any manner or for any reason. The Seller further agrees that the Buyer shall retain for its own account any amounts collected pursuant to the foregoing powers, and the Seller shall promptly transfer and deliver to the Buyer any cash or other property received by the Seller after the Closing Date in respect of any accounts receivable or otherwise relating to the Assets or the Business.

1.8 Non-Assignable Assets. Anything contained in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement or an attempted agreement to transfer, sublease or assign any contract, license, lease, commitment, sales order, purchase order or other agreement, or any claim or right of any benefit arising thereunder or resulting therefrom if any such attempted transfer, sublease or assignment thereof, without the consent of any other party thereto, would constitute a breach thereof or in any way affect the rights of the Buyer thereunder. The Seller shall, between the date hereof and the Closing Date and, if requested by the Buyer, after the Closing Date, use its best efforts to obtain the consent of any party or parties to any such contracts, licenses, leases, commitments, sales orders, purchase orders or other agreements to the transfer, sublease or assignment thereof by the Seller to the Buyer hereunder in

... which such consent is required for transfer, sublease or assignment. If any such ... is not obtained, or if any attempted assignment thereof would be ineffective or would ... the rights of the Seller thereunder such that the Buyer would not in fact receive the ...tial benefit of such rights, the Seller shall use reasonable efforts to perform such ...ent for the account of the Buyer or otherwise cooperate with the Buyer in any ...ement necessary or desirable to provide for the Buyer the benefits under any such ...ement, including, without limitation, enforcement for the benefit of the Buyer of any and all ... of the Seller against the other party thereto arising out of the breach, termination or ...ellation of such agreement by such other party or otherwise.

1.9 Allocation of Purchase Price. The Purchase Price shall be allocated to the Assets ... forth on Schedule 1.9. Seller and Buyer agree to utilize the allocation of the Purchase ... set forth on Schedule 1.9 for purposes of Section 1060 of the Internal Revenue Code.

## 2. CLOSING

2.1 Place and Time of Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Shack & Siegel, P.C., 530 Fifth Avenue, New York, New York 10036, at 10:00 a.m. on the first business day following the satisfaction or waiver of all conditions set forth herein to the obligations of the parties to consummate the transactions contemplated hereby (other than conditions to be satisfied at or concurrently with the Closing) or on such other date and at such other place as the Buyer and Seller may mutually determine (the "Closing Date"). All transactions occurring at the Closing shall be deemed to occur concurrently.

2.2 Delivery of Documents; Payment of Purchase Price. At the Closing, in addition to the actions described in Articles 6 and 7 hereof:

(i) the Buyer shall pay to the Seller the Purchase Price, less the Holdback Amount; and

(ii) the Buyer will remit the Holdback Amount to the escrow agent named in the escrow agreement referred to in Sections 7.19 hereof; and

(iii) the Seller shall execute and deliver to the Buyer such other instruments and documents of assignments as are reasonably requested by the Buyer to vest in the Buyer title to the Assets.

## 3. REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants that all of the following representations and warranties are true at the date of this Agreement and shall be true at the time of Closing.

3.1 Due Organization. The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas and has all requisite power and authority to own, lease, use and operate its properties and assets at and in the places where such properties and assets are located and to carry on its business as it is now being conducted. The Seller is duly qualified to do business and is in good standing in each jurisdiction in which the nature of

business or the ownership or leasing of its properties makes such qualification necessary, except where the failure to be so authorized or qualified would not reasonably be expected to have a material adverse effect upon the operations, properties, assets, condition (financial or otherwise), or prospects of the Seller or the value of the Business (as used herein with respect to the Seller, or with respect to any other person, a "Material Adverse Effect").

3.2 Authorization; Validity of Obligations. The representatives of the Seller have the authority to enter into and bind the Seller to the terms of this Agreement and the other documents and instruments to be delivered pursuant to this Agreement and the Seller has the full legal right, power and authority to enter into this Agreement and the other documents and instruments to be delivered pursuant to this Agreement and to consummate the sale of the Assets contemplated hereby. Copies of the certificate of incorporation and bylaws of the Seller and of resolutions adopted by the board of directors and the stockholders of the Seller approving this Agreement and the sale of the Assets contemplated hereby, certified by the Secretary or an Assistant Secretary of the Seller, are attached hereto as Schedule 3.2. This Agreement has been validly executed and delivered by the Seller and constitutes the legal, valid and binding obligation of the Seller enforceable in accordance with its terms subject to approval by holders of at least two-thirds of the outstanding shares of the Seller, except that the enforceability of the Agreement may be limited by or subject to, any bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally. Except as set forth on Schedule 3.2, the Seller has good and marketable title to all of the Assets, free and clear of any lien, pledge, claim or encumbrance. Upon consummation of the transactions contemplated by this Agreement, Seller will deliver to Buyer good and marketable title to the Assets, free and clear of any lien, pledge, claim or encumbrance.

3.3 Capitalization of the Seller. Schedule 3.3 sets forth the authorized and outstanding securities of and equity interests in the Seller and the identification of all holders of more than 5% of the shares of the Seller including the number of shares owned by each, and, if applicable, the identity of any other person or entity having the right to vote or make decisions with respect to the transfer of such shares. Except as set forth on Schedule 3.3 there are no authorized or outstanding securities of the Seller and no securities of the Seller are reserved for issuance. All outstanding securities of the Seller are duly authorized, validly issued, fully paid and nonassessable and, except as set forth on Schedule 3.3, there are no authorized, issued or outstanding convertible securities of the Seller nor are there any outstanding options, warrants, agreements, rights or commitments of any kind relating to the authorized but unissued securities of the Seller.

3.4 Subsidiaries. The Seller has no subsidiaries or d/b/a names and has not conducted business under any other name except Surgical Sense, Inc.

3.5 No Conflicts. Except as set forth in Schedule 3.5 the execution and delivery by the Seller of this Agreement and the documents and instruments contemplated hereby, the consummation of the transactions contemplated hereby and thereby and the performance by the Seller of its obligations hereunder and thereunder:

(i) do not and will not conflict with or violate any provision of the certificate of incorporation or bylaws of the Seller;

(ii) do not and will not conflict with or result in any breach of any condition or provisions of, or constitute a default under or give rise to any right of termination, cancellation or acceleration (whether after the giving of notice or lapse of time or both) of any contract, mortgage, lien, lease, agreement, indenture, instrument, judgment or decree to which the Seller is a party or which is or purports to be binding upon the Seller or which affects or purports to affect any of the Assets, or result in the creation or imposition of any lien, charge, pledge, security interest or other encumbrance upon any of the Assets; and

(iii) do not and will not conflict with or result in a violation of or default under (with or without notice of the lapse of time or both), any statute, regulation, rule, judgment, order, decree, stipulation, injunction, charge or other restriction of any court, administrative agency or commission or other governmental authority or instrumentality which is applicable to Seller.

3.6 Government Approval. No action, approval consent, authorization or other action including, but not limited to, any action, approval, consent or authorization by or filing with any governmental or quasi-governmental agency, commission, board, bureau or instrumentality is necessary or required as to the Seller for the due execution, delivery or performance by the Seller of this agreement or any document or instrument contemplated hereby.

3.7 Financial Statements. Copies of the following financial statements are attached as Schedule 3.7:

(i) the balance sheet of the Seller as of December 31, 1997 and 1998 and the related statements of operations, stockholders' equity and cash flows for the one-year periods ended December 31, 1997 and 1998, together with the related notes and schedules (such balance sheets and related statements, notes and schedules are referred to as the "Year-End Financial Statements"); and

(ii) the balance sheet of the Seller as of June 30, 1999 (the "Balance Sheet" and such date, the "Balance Sheet Date") and the related statements of operations for the six-month period ended June 30, 1999, together with the related notes and schedules (such balance sheet and related statements, notes and schedules are referred to as the "Interim June Financial Statements"

(iii) the balance sheet of the Seller as of September 30, 1999 and the related statements of operations for the nine-month period ended September 30, 1999, together with the related notes and schedules (such balance sheet and related statements, notes and schedules are referred to as the "Interim September Financial Statements"). The Interim June Financial Statements and the Interim September Financial Statements are collectively referred to as the "Interim Financial Statements". The Year-End Financial Statements and the Interim Financial Statements are collectively referred to as the "Financial Statements".

The Financial Statements are true, correct and complete in all material respects and have been prepared from the books and records of the Seller. The Year-End

Financial Statements have been certified by Rylander, Clay & Opitz, L.L.P., independent certified, public accountants, as having been prepared in conformity with generally accepted accounting principles ("GAAP") applied on a basis consistent with preceding years and throughout the periods involved and present fairly the financial position and results of operations of the Seller as of the dates of such statements and for the periods covered thereby. The Interim Financial Statements have been prepared on a basis consistent with the Year-End Financial Statements and present fairly the financial position and results of operations of the Seller as of the dates of such statements and for the periods covered thereby. The books of account of the Seller have been kept accurately in all material respects in the ordinary course of business, the transactions entered therein represent bona fide transactions, and the revenues, expenses, assets and liabilities of the Seller have been properly recorded therein in all material respects.

3.8 Liabilities and Obligations. Except as and to the extent disclosed and adequately provided for in the Financial Statements (including any notes or schedules thereto) or on Schedule 3.8, the Seller had no liabilities or obligations of a nature required to be disclosed in the Financial Statements, whether accrued, absolute, secured or unsecured, contingent or otherwise.

3.9 No Adverse Change. Except as set forth on Schedule 3.9 since June 30, 1999 no event has occurred that has had a Material Adverse Effect on the Seller and the Seller has not:

(i) incurred any damage, destruction or similar loss, whether or not covered by insurance, materially and adversely affecting the business, assets or properties, tangible or intangible, of the Seller;

(ii) other than in the ordinary course of business, sold, assigned, transferred or otherwise disposed of any tangible assets;

(iii) sold, assigned, transferred, licensed or otherwise disposed of any intangible assets or Intellectual Property;

(iv) mortgaged, pledged, granted or suffered to exist any lien or other encumbrance or charge on any assets or properties, tangible or intangible, including any Intellectual Property;

(v) other than in the ordinary course of business, waived any rights or cancelled, discharged, satisfied or paid any debt, claim, lien, encumbrance, liability or obligation, whether absolute, accrued, contingent or otherwise and whether due or to become due;

(vi) other than in the ordinary course of business, leased or effected any transfer of any tangible assets, properties, or rights;

(vii) entered into, made any amendment of or terminated any lease, contract, license or other agreement;

(viii) effected any change in accounting practices, procedures or methods;

(ix) paid, loaned or advanced any amount to or sold, transferred or leased any properties or assets (real, personal or mixed, tangible or intangible) to, or entered into any agreement, arrangement or transaction of any nature with any stockholder, any officer or director of the Seller, any "affiliate" or "associate" of any stockholder, officer or director of the Seller (as such terms are defined in the rules and regulations of the Securities and Exchange Commission promulgated under the Securities Act of 1933, as amended), or any business or entity in which any stockholder, any officer or director of the Seller or any "affiliate" or associate" of any of such persons has any direct or indirect interest, except for regular compensation paid to or stockholders or affiliates of stockholders, who are also employees of the Seller;

(x) increased the compensation payable to any stockholder, officers or employees or become obligated to increase any such compensation;

(xi) entered into any other transaction other than in the ordinary course of business and consistent with past practices, or changed in any way the business policies or practices of the Seller.

3.10 Permits and Licenses. The Seller holds all licenses, franchises, permits and other governmental approvals, concurrences and authorizations required in connection with the conduct of the Business. Schedule 3.10 sets forth an accurate list and summary description of all such licenses, franchises, permits and other governmental approvals, concurrences and authorizations, including permits, titles, licenses, franchises and certificates, owned or held by the Seller ("Permits"). The Permits listed on Schedule 3.10 are valid, and the Seller has not received any notice that any person intends to cancel, terminate or not renew any such Permit, and there is no basis for termination or non-renewal of any Permit. Except as specifically set forth on Schedule 3.10, the transactions contemplated by this Agreement will not result in a default under or a breach or violation of, or adversely affect the rights and benefits afforded to the Seller by, any such Permits.

3.11 Personal Property. Schedule 3.11 sets forth an accurate list of (i) all personal property included in "plant, property and equipment" on the Balance Sheet and the location thereof, (ii) all other personal property owned by the Seller with an individual value in excess of $10,000 and the location thereof (a) as of the Balance Sheet Date and (b) acquired since the Balance Sheet Date and (iii) all leases and agreements in respect of personal property of the Seller. True, correct and complete copies of all of the documents listed on Schedule 3.11 have been delivered to the Buyer. Except as set forth and specifically described on Schedule 3.11, (1) all material personal property used or held for use by the Seller in the Business is in good working order and is either owned by the Seller or leased by the Seller pursuant to a lease listed on Schedule 3.11, and (2) all leases and agreements listed on Schedule 3.11 are in full force and effect and constitute valid and binding agreements of the parties thereto or their successors in accordance with their respective terms, and no party to any such lease or agreement or their successor is in default.

3.12 Material Contracts and Commitments. Schedule 3.12 sets forth a list of all material contracts, commitments and similar agreements to which the Seller, is a party or by which it or any of its properties are bound (including, but not limited to, contracts with significant customers, joint venture or partnership agreements, contracts with any labor organizations, strategic alliances and options to purchase land). A contract or commitment shall be deemed material if it has a term in excess of six months or involves more than $25,000. True, complete and correct copies of all contracts, commitments and agreements required to be listed on Schedule 3.12 have been delivered to the Buyer. Except as described on Schedule 3.12, the Seller has complied with all material commitments and obligations pertaining to it, and no party or their successor is in default under any contracts or agreements listed on Schedule 3.12, no notice of default under any such contract or agreement has been received and the Seller has no knowledge of the existence of any basis for any such default or claim of default.

3.13 Real Property. The Seller owns no real property. Schedule 3.13 includes a list of all real property leased by the Seller at the date hereof, and all other real property, if any, used by the Seller in the conduct of its business. True, complete and correct copies of all leases and agreements in respect of real property leased by the Seller have been delivered to Buyer, and an indication as to which such properties, if any, are currently owned, or were formerly owned, by any stockholder of the Seller is included in Schedule 3.13. Except as set forth on Schedule 3.13, all of such leases included on Schedule 3.13 are in full force and effect and constitute valid and binding agreements of the parties (and their successors) thereto in accordance with their respective terms, and no party or their successor to any such lease is in default.

3.14 Insurance. Schedule 3.14 sets forth an accurate list as of the Balance Sheet Date of all insurance policies carried by Seller. All such insurance policies are currently in full force and effect.

3.15 Compensation; Employment Agreements; Organized Labor Matters. Schedule 3.15 sets forth an accurate list showing all officers and employees of the Seller, listing all employment agreements with such officers and employees and the rate of compensation (and the portions thereof attributable to salary, bonus and other compensation, respectively) of each of such persons as of the date hereof. True, complete and correct copies of any employment agreements with the persons listed on Schedule 3.15 have been delivered to the Buyer. Since the Balance Sheet Date, there have been no increases in the compensation payable or any special bonuses to any officer, director, or employee of the Seller. Except as set forth on Schedule 3.15, (i) the Seller is not bound by or subject to (and none of its respective assets or properties is bound by or subject to) any arrangement with any labor union, (ii) no employees of the Seller are represented by any labor union or covered by any collective bargaining agreement, (iii) to the knowledge of the Seller, no campaign to establish such representation is in progress and (iv) there is no pending or, to the Seller's knowledge, threatened, labor dispute involving the Seller and any group of its employees. The Seller has not experienced any labor interruptions over the past five years. To the knowledge of the Seller, the Seller's relationship with its employees is good.

3.16 Employee Benefit Plans. Except for the employee benefit plans, if any, described in Schedule 3.16, the Seller does not sponsor, maintain or contribute to any plan program, fund or arrangement that constitutes an "employee pension benefit plan," nor does the Seller have any obligation to contribute to or accrue or pay any benefits under any deferred compensation or retirement funding arrangement subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), nor does the Seller have any non-qualified employee benefit plans. The Seller is in compliance with all requirements of ERISA.

3.17 Conformity with Law; Litigation. Except as set forth on Schedule 3.17, there are no claims, actions, suits or proceedings, pending or, to Seller's knowledge, threatened against or affecting the Seller, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality having jurisdiction over the Seller. The Seller is not in violation in any material respect of any law or regulation or any order of any court or federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality having jurisdiction over it.

3.18 Taxes. For purposes of this Agreement, the term "Taxes" shall mean all taxes, charges, fees, levies or other assessments including, without limitation, income, gross receipts, excise, property, sales, withholding, social security, unemployment, occupation, use, service, license, payroll, franchise, transfer and recording taxes, fees and charges, imposed by the United States or any state, local or foreign government or subdivision or agency thereof, whether computed on a separate, consolidated, unitary, combined or any other basis; and such term shall include any interest, fines, penalties or additional amounts attributable to or imposed with respect to any such taxes, charges, fees, levies or other assessments. The Seller has timely filed all requisite federal, state and other Tax returns or extension requests for all fiscal periods ended on or before the Balance Sheet Date and the Seller has paid all Taxes due. Except as set forth on Schedule 3.18, there are no examinations in progress or claims against the Seller for federal, state or other Taxes (including penalties and interest) for any period or periods prior to or on the Balance Sheet Date and no notice of any claim for Taxes, whether pending or threatened, has been received by or on behalf or the Seller.

3.19 No Violations; No Consents Required. The Seller is not in violation of its certificate of incorporation or bylaws, each as amended to date ("Charter Documents"). Neither the Seller, nor any other party thereto, is in default under any lease, instrument, license, permit or agreement to which the Seller is a party or by which its properties are bound (the "Third Party Documents"). Except as set forth in Schedule 3.19, the execution of this Agreement and the performance of the obligations hereunder and the consummation of the transactions contemplated hereby do not require the consent of any third party except for such consents as have been obtained.

3.20 Sufficiency of Assets. Subject to the need for working capital, the Assets are sufficient to enable the Buyer to operate and conduct the Business after the Closing Date in substantially the same manner as the Business was conducted by the Seller during the 12-month period immediately prior to the Closing Date.

3.21 Intellectual Property.

(i) Except as set forth in Schedule 3.21(a), the Seller is the exclusive owner of the Owned Intellectual Property and owns the same free and clear of any lien, pledge, claim or encumbrance, or restrictions on use or transfer.

(ii) Except as set forth in Schedule 3.21(a), Seller's title to all of the Owned Intellectual Property is valid and subsisting.

(iii) Except as set forth in Schedule 3.21(b), no claim has been made or threatened, nor is pending against the Seller, or any employee or consultant of the Seller: (a) alleging that the manufacture, use, sale, offer for sale or importation of any Seller Products or use of any of the Intellectual Property infringes the rights of any third party; or (b) challenging the validity or ownership of any Intellectual Property. "Seller Products" are any model or style of the Kugel Hernia Patch, including those model numbers set forth in Schedule 3.21(c).

(iv) To the knowledge of the Seller, none of the Intellectual Property is being infringed by any third party.

(v) Except as set forth in the affidavits attached to Schedule 3.21(a) ("Affidavits"), to Seller's knowledge, prior to September 29, 1993, there was no disclosure of any invention claimed in any of the patents or patent applications listed on Schedule 1.1(a) that may cause such claims to be invalid.

(vi) The Seller is in substantial compliance with all terms and conditions of its licenses and agreements relating to the Licensed Intellectual Property.

(vii) To the knowledge of the Seller, each third party to each agreement with the Seller relating to Licensed Intellectual Property is in compliance with all terms and conditions of such agreement and the Seller has not received any notice threatening to terminate any such agreement.

(viii) Except as set forth in Schedule 3.21(b), the Seller has not received any communication or claim alleging that Seller has violated or infringed, or by conducting the Business as proposed would violate or infringe, any patent, trademark, copyright or trade secret or other proprietary right of a third party, and Seller possesses sufficient licenses or other rights to use all Intellectual Property necessary to conduct the Business. Except as set forth in Schedule 3.21(b), to the knowledge of the Seller, the manufacture, sale, offer for sale or importation of any Seller Products or the use of Intellectual Property, as currently used by the Seller does not infringe the proprietary rights of a third party.

(ix) To Seller's knowledge, none of the material processes and formulae, research and development, or other know-how relating to the Business, the value of which is contingent upon maintenance of the confidentiality thereof, has been

disclosed to any third party other than attorneys for the Seller or third parties bound by written confidentiality agreements.

(x) To Seller's knowledge, no Intellectual Property of the Seller was developed by any employee or contractor of the Seller when such employee or contractor was employed or retained by a third party.

(xi) To Seller's knowledge, (a) the facts recited in the Affidavits are true and accurate; (b) the Affidavits disclose all facts that are relevant and material to the patentability and enforceability of the Kugel Patents, including, but not limited to, all material and relevant facts prior to September 29, 1993, related to any implantations or other procedures involving a Kugel Hernia Patch, any offers for sale of a Kugel Hernia Patch, the structure of each Kugel Hernia Patch so implanted and/or offered for sale (if any), and any disclosures to third parties related to a Kugel Hernia Patch; and (c) none of such information was intentionally withheld from any prior filings with the U.S. Patent Office.

(xii) To Seller's knowledge, there are no other inventors required to be named as inventors on the Kugel Patents or Patent Applications.

(xiii) To Seller's knowledge, the Kugel Patents set forth the best mode contemplated by the inventors of carrying out the claimed inventions as of the respective filing dates of the Patent Applications and the applications that resulted in the Kugel Patents.

(xiv) To Seller's knowledge, with the possible exception of the facts set forth in the Affidavits, all relevant and material information relating to the claimed inventions known to each individual associated with the filing and prosecution of any of the applications that resulted in the Kugel Patents was disclosed to the U.S. Patent Office during the prosecution of the applications that resulted in the Kugel Patents.

3.22 Accounts Receivable. Except as set forth on Schedule 3.22, each account receivable reflected on the Balance Sheet constitutes, and each account receivable on the Closing Date Balance Sheet will constitute, a *bona fide* receivable resulting from a *bona fide* sale or other transaction with a customer or licensee in the ordinary course of business, the amount of which was actually due on the date of each such balance sheet and has been or will be collected in the ordinary course of business, subject to customary reserves. The books and records of the Seller state correctly the facts with respect to each account receivable reflected therein and the balance due thereon. Each payment reflected on such books and records as having been made on each such account receivable was made by the respective account debtor and not directly or indirectly by any stockholder, director, officer, employee or agent of the Seller unless such person is shown on said books and records as such account debtor. Each document and instrument evidencing, securing or relating to each account receivable, including, without limitation, each insurance policy, certificate, bill or statement, is correct and complete in all respects, is genuine and valid and is enforceable in accordance with its terms. There are no defenses, claims of disability, counterclaims, offsets, refusals to pay or other rights of set-off against any accounts receivable

to the knowledge of the Seller, there is no threatened, intended or proposed defense, claim disability, counterclaim, offset, refusal to pay or other right of set-off with respect thereto. Each account receivable, each document and instrument and each transaction underlying or relating thereto conforms in all material respects, including, without limitation, in respect of interest rates charges, notices given and disclosures made, to the requirements and provisions of each applicable law, rule, regulation or order relating to credit, consumer credit, credit practices, credit advertising, credit reporting, retail installment sales, credit cards, collections, usury, interest rates and truth-in-lending, including, without limitation, the Federal Truth in Lending Act, as amended and Regulation Z issued by the Board of Governors of the Federal Reserve System thereunder.

3.23 Inventory. Except as set forth on Schedule 3.23, all inventory reflected on Schedule 1.3 was and all inventory reflected on the Closing Date Balance Sheet will be determined in accordance with generally accepted accounting principles, stated at the lower of cost (based on the first-in, first-out method) or market value. The inventory conforms to customary trade standards for marketable goods. Proper recognition has been given in Schedule 1.3 and proper recognition will be given in the Closing Date Balance Sheet to damaged, obsolete, slow-moving, irregular or defective stock and to appropriate markdowns. Since June 30, 1999 there have been no changes in the inventory except in the ordinary course of business.

3.24 Environmental Warranties.

(i) "Environmental Laws" means all applicable federal, state or local statues laws, ordinances, codes, rules, regulations and guidelines (including consent decrees and administrative orders) relating to public health and safety and protection of the environment.

(ii) "Hazardous Material" means

(a) any "hazardous substance", as defined by the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended ("CERCLA");

(b) any "hazardous waste", as defined by the Resource Conservation and Recovery Act, as amended;

(c) any petroleum product; or

(d) any pollutant or contaminant or hazardous, dangerous or toxic chemical, material or substance within the meaning of any other applicable federal, state or local law, regulations, ordinance or requirement (including consent decrees and administrative orders) relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, all as amended or hereafter amended.

(iii) All facilities and property (including underlying groundwater) operated by the Seller have been, and continue to be, owned or leased by the Seller in compliance with all Environmental Laws.

(iv) There have been no past, and there are no pending or threatened (i) claims, complaints, notices or requests for information received by the Seller with respect to any alleged violation of any Environmental Law, or (ii) complaints, notices or inquiries to the Seller regarding potential liability under any Environmental Law.

(v) There have been no releases of Hazardous Materials at, on or under any property now or previously owned or leased by the Seller that, singly or in the aggregate, have, or may reasonably be expected to have, a Material Adverse Effect.

(vi) The Seller has been issued and is in compliance with all permits, certificates, approvals, licenses and other authorizations relating to environmental matters and necessary or desirable for its business.

(vii) No property now or previously owned or leased by the Seller is listed or, to the knowledge of the Seller, proposed for listing (with respect to owned property only) on the National Priorities List pursuant to CERCLA, on the Comprehensive Environmental Response Compensation Liability Information System List ("CERCLIS") or on any similar state list of sites requiring investigation or clean-up;

(viii) There are no underground storage tanks, active or abandoned, including petroleum storage tanks, on or under any property now or previously owned or leased by the Seller that, singly or in the aggregate, have, or may reasonably be expected to have, a Material Adverse Effect.

(ix) The Seller has not directly transported or directly arranged for the transportation of any Hazardous Material to any location which is listed or, to the knowledge of the Seller, proposed for listing on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar state list or which is the subject of federal, state or local enforcement actions or other investigations which may lead to claims against the Seller for any remedial work, damage to natural resources or personal injury, including claims under CERCLA.

(x) There are no polychlorinated biphenyls or friable asbestos present at any property now or previously owned or leased by the Seller that, singly or in the aggregate, have, or may reasonably be expected to have, a Material Adverse Effect.

(xi) No conditions exist at, on or under any property now or previously owned or leased by the Seller which, with the passage of time, or the giving of notice or both, would give rise to liability under any Environmental Law.

3.25 <u>Year 2000 Compliance</u>. The Seller's information technology, including, but not limited to, computer software, imbedded technology and all applicable computer hardware (whether general or specific purpose) and other similar or related items of automated, computerized hardware or software system(s) that are used or relied on by the Seller in the conduct of the Business ("Information Technology") is Year 2000 Compliant (as hereinafter defined) in all material respects. The Information Technology of the Seller and its customers and suppliers is Year 2000 Compliant. "Year 2000 Compliant" means that information technology is

designed to be used prior to, during and after the calendar year 2000 A.D. and will accurately receive, provide and process date/time data (including, but not limited to, calculating, composing and sequencing) from, into and between the 20th and 21st centuries, including the years 1999 and 2000, and leap-year calculations and to not malfunction, cease to function, or provide invalid or incorrect results as a result of date/time data.

3.26 Undisclosed Liabilities. Other than the specific liabilities identified in this Agreement and in the Schedules to this Agreement, there are no material liabilities or obligations of the Seller, secured or unsecured (whether absolute, accrued, contingent or otherwise, whether due or to become due), including without limitation, liabilities or obligations to customers, suppliers, licensees or licensors, required by generally accepted accounting principles to be reflected in the balance sheet of a corporation or disclosed in the notes thereto, which are not fully set forth in a Schedule hereto or on the Financial Statements.

3.27 Accuracy of Information. Neither this Agreement nor the representations and warranties by the Seller contained herein or in any documents, instruments, certificates or schedules furnished by the Seller pursuant hereto or in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements or facts contained herein and therein not misleading.

## 4. REPRESENTATIONS OF THE BUYER

The Buyer represents and warrants that all of the following representations and warranties in this Section 4 are true at the date of this Agreement and shall be true at the time of Closing.

4.1 Due Organization. The Buyer is a corporation validly existing and in good standing under the laws of the State of New Jersey, and has the requisite power and authority to carry on its business as it is now being conducted.

4.2 Authorization, Validity of Obligations. (i) The representatives of the Buyer executing this Agreement have the authority to enter into and bind the Buyer to the terms of this Agreement and (ii) the Buyer has the full legal right, power and authority to enter into this Agreement and the other documents and instruments to be executed and delivered by the Buyer pursuant to this Agreement and to consummate the purchase of the Assets contemplated hereby, all of which have been approved by board of directors of the Buyer. This Agreement has been validly executed and delivered by the Buyer and constitutes the legal, valid and binding obligation of the Buyer enforceable in accordance with its terms, except that the enforceability of the Agreement may be limited by or subject to, any bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally.

4.3 No Violations. The execution of this Agreement and the performance of the obligations hereunder and the consummation of the transactions contemplated hereby will not result in any violation or breach or constitute a default under any of the terms or provisions of the Certificate of Incorporation or the By-laws of the Buyer or any material agreement, judgment or decree to which the Buyer or its affiliates is a party, nor will it result in a violation or default under (with or without notice of the lapse of time or both), any statute, regulation, rule,

judgment, order, decree, stipulation, injunction, charge or other restriction of any court, administrative agency or commission or other governmental authority or instrumentality that is applicable to Buyer or its affiliates.

## COVENANTS PRIOR TO CLOSING

5.1 Access and Cooperation; Due Diligence. Between the date of this Agreement and the Closing Date, the Seller will afford to the officers and authorized representatives of the Buyer access to all of the Seller's sites, properties, books and records and will furnish the Buyer with such additional financial and operating data and other information as to the business and properties of the Seller as the Buyer may from time to time reasonably request. The Seller will cooperate with the Buyer, its representatives, auditors and counsel in the preparation of any documents or other material which may be required in connection with any documents or materials required by this Agreement. The Buyer and the Seller will treat all information obtained in connection with the negotiation and performance of this Agreement as confidential in accordance with the provisions of Section 12.

5.2 Conduct of Business Pending Closing. Between the date of this Agreement and the Closing Date, the Seller will, except as set forth on Schedule 5.2:

(i) carry on its business in substantially the same manner as heretofore carried on by the Seller and not introduce any new method of management, operation or accounting;

(ii) maintain its respective properties and facilities, including those held under leases, in as good working order and condition as at present, ordinary wear and tear excepted;

(iii) perform in all material respects all of its respective obligations under agreements relating to or affecting its respective assets, properties or rights and maintain its Intellectual Property;

(iv) keep in full force and effect present insurance policies or other comparable insurance coverage;

(v) use its reasonable efforts to maintain and preserve its business organization intact, retain its present key employees and maintain its relationships with suppliers, customers and others having business relations with the Seller; and

(vi) maintain compliance with all Permits in all material respects and with all laws, rules and regulations, consent orders, and all other orders of applicable courts, regulatory agencies and similar governmental authorities.

5.3 Prohibited Activities. Except as set forth on Schedule 5.3, between the date hereof and the Closing Date, the Seller will not, without prior written consent of the Buyer:

(i) enter into or amend any contract or commitment or incur or agree to incur any liability or make any capital expenditures, except in the normal course of

business consistent with past practice in an amount not in excess of $10.000 in any one instance or $50,000 in the aggregate;

(ii) sell, assign, lease, transfer or otherwise dispose of any tangible assets except sales of inventory in the normal course of business;

(iii) sell, assign, transfer, license or otherwise dispose of any intangible assets or Intellectual Property or enter into any contract or commitment with respect thereto;

(iv) merge or consolidate or agree to merge or consolidate with or into any other entity;

(v) increase or commit to any increase in the salary, bonus, commission or other compensation of any stockholder, officer, employee or agent of the Seller;

(vi) authorize, issue, sell or convert any securities or enter into any agreement with respect thereto;

(vii) declare, set aside or make any distribution to stockholders or purchase, redeem or reclassify any securities or effect any recapitalization or enter into any agreement in respect of the foregoing;

(viii) mortgage, pledge, grant or suffer to exist any lien, charge or other encumbrance on any of its assets or properties, tangible or intangible;

(ix) waive any rights or cancel, discharge, satisfy or pay any debt, claim, lien, encumbrance, liability or obligation, whether absolute, accrued, contingent or otherwise and whether due or to become due;

(x) incur any obligation or liability (absolute or contingent, liquidated or unliquidated, choate or inchoate) except current obligations and liabilities incurred in the ordinary course of their business;

(xi) amend the certificate of incorporation or bylaws of the Seller except as may be required in order for the Seller to change its name;

(xii) effect any change in the accounting practices, procedures or methods of the Seller;

(xiii) pay, loan or advance any amount to or sell, transfer, license or lease any properties or assets (real, personal or mixed, tangible or intangible) to, or enter into any agreement, arrangement or transaction of any nature with any stockholder, any officer of the Seller, any "affiliate" or "associate" of any partner or officer of the Seller (as such terms are defined in the rules and regulations of the Securities and Exchange Commission promulgated under the Securities Act of 1933, as amended), or any business or entity in which any stockholder, any officer of the Seller or any "affiliate" or associate" of any of such persons has any direct or indirect interest,

except for regular compensation paid to stockholders or affiliates of stockholders. who are also employees of the Seller;

(xiv) increase the compensation payable to any stockholder, officer or employee or become obligated to increase any such compensation;

(xv) enter into any transaction other than in the ordinary course of business, or change in any way any of the business polices or practices of the Seller.

5.4 Consultation. The Seller shall, from the date hereof through the Closing Date, consult with the Buyer on a regular basis with respect to all operating decisions which could reasonably be expected to result in a change in the Business as presently operated or which are not in the ordinary course of the Business.

5.5 Notification of Certain Matters. The Seller shall give prompt notice to the Buyer of (i) the occurrence or non-occurrence of any event the occurrence or non-occurrence of which would be likely to cause any representation or warranty of the Seller contained herein to be untrue or inaccurate in any respect at or prior to the Closing and (ii) any failure of the Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied hereunder. The Buyer shall give prompt notice to the Seller of (a) the occurrence or non-occurrence of any event the occurrence or non-occurrence of which would be likely to cause any representation or warranty of the Buyer contained herein to be untrue or inaccurate in any respect at or prior to the Closing and (b) any failure of the Buyer to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder. The delivery of any notice pursuant to this Section 5.5 shall not be deemed to (1) modify the representations or warranties hereunder of the party delivering such notice, (2) modify the conditions to Closing set forth herein, or (3) limit or otherwise affect the remedies available hereunder to the party receiving such notice.

5.6 Notice of Change of Scheduled Information. Each party hereto agrees that, with respect to the representations and warranties of such party contained in this Agreement, such party shall have the continuing obligation until the Closing occurs to notify the other parties hereto with respect to any matter hereafter arising or discovered which, if existing or known at the date of this Agreement, would have been required to be set forth or described in the Schedules.

5.7 Product Liability Insurance. Effective as of the Closing Date and for a period of two years thereafter, Seller shall secure and maintain product liability insurance naming Buyer and its affiliates as an additional insured party with respect to product liability claims resulting from claims made after the Closing Date relating to products sold by Seller on or prior to the Closing Date (the "Product Insurance"). At the Closing, Seller shall furnish an effective certificate of insurance evidencing the required coverage naming Buyer and its affiliates as an additional insured party. The Product Insurance shall provide for at least 30 days prior written notice to Buyer of the cancellation or substantial modification thereof and shall be issued by a responsible insurance carrier in the United States of America having an AM Best rating of not less than A with a limit of liability of not less than U.S. $5,000,000 per year on a claims made basis and $5,000,000 per occurrence without any deductible or self-insured retention. After the

Closing, Seller shall furnish at the request of Buyer evidence of the maintenance of such insurance.

5.8 Atrium Inventory. Seller has issued the purchase orders described in Schedule 5.22 to Atrium. If and to the extent the inventory described therein (the "Atrium Inventory") is delivered prior to the Closing Date, Seller shall accept delivery of and pay for such Atrium Inventory and deliver the same to Buyer. Any Atrium Inventory delivered and paid for by Seller prior to the Closing shall be included in the adjustment to the Purchase Price contemplated by Section 1.3 hereof. If the Atrium Inventory is not delivered prior to the Closing Date, Seller shall accept delivery of and pay for such Atrium Inventory and deliver the same to Buyer. Within 15 days after delivery to Buyer of confirmation of receipt of any Atrium Inventory and the original invoice therefor, Buyer shall reimburse Seller for the cost of any inventory paid for by Seller after the Closing.

5.9 Further Assurances. The parties hereto agree to execute and deliver, or cause to be executed and delivered, such further instruments or documents or take such other action as may be reasonably necessary or convenient to carry out the transactions contemplated hereby.

**6. CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLER.**

The obligations of the Seller with respect to actions to be taken on the Closing Date are subject to the satisfaction or waiver on or prior to the Closing Date of all of the following conditions.

6.1 Representations and Warranties; Performance of Obligations. All representations and warranties of the Buyer contained in Section 4 shall be true and correct in all material respects as of the Closing Date as though such representations and warranties had been made as of that time; all of the terms, covenants and conditions of this Agreement to be complied with and performed by the Buyer on or before the Closing Date shall have been duly complied with and performed in all material respects; and a certificate to the foregoing effect in the form annexed hereto as Annex I dated the Closing Date and signed by the President or any Vice President of the Buyer, shall have been delivered to the Seller.

6.2 Opinion of Counsel. The Seller shall have received an opinion signed by counsel to the Buyer, dated the Closing Date, in the form annexed hereto as Annex II.

6.3 Consents and Approvals; No Restraint. All necessary consents of and filings with any governmental authority or agency relating to the consummation of the transactions contemplated herein shall have been obtained and made and no action or proceeding shall have been instituted by any governmental authority or agency or any third party to restrain or prohibit the purchase of the Assets contemplated hereby.

6.4 Buyer's Incumbency Certificate. The Seller shall have received an incumbency certificate, in form annexed hereto as Annex III, dated the Closing Date, signed by the Secretary or Assistant Secretary to the Buyer.

6.5 Buyer's Authorizing Resolution. The Seller shall have received a certificate. in form annexed hereto as Annex IV, dated the Closing Date signed by the Secretary or Assistant Secretary of the Buyer.

6.6 Inman Agreement. The Buyer shall have executed and delivered to the Seller a consulting and non-compete agreement, in form annexed hereto as Annex V, dated the Closing Date, between the Buyer and Joel Douglas Inman.

6.7 Biggers Agreement. The Buyer shall have executed and delivered to the Seller a consulting and non-compete agreement, in form annexed hereto as Annex VI, dated the Closing Date, between the Buyer and Keith D. Biggers.

6.8 Assumption Agreement. The Buyer shall have executed and delivered to the Seller an assumption agreement, in form annexed hereto as Annex VII, dated the Closing Date.

6.9 Employment Agreements. The Buyer shall have offered to employ, as of the Closing Date, those employees of Seller listed on Schedule 6.9 by execution and delivery to the Seller, on the Closing Date, of agreements in form annexed hereto as Annex VIII.

6.10 Other Offers of Employment. The Buyer shall have offered to employ, as of the Closing Date, those employees of the Seller listed on Schedule 6.10 at the applicable rate of compensation set forth on Schedule 6.10.

6.11 Escrow Agreement. The Buyers shall have executed and delivered to the Seller an escrow agreement in the form annexed hereto as Annex XXII, dated the Closing Date.

## 7. CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER

The obligations of the Buyer with respect to actions to be taken on the Closing Date are subject to the satisfaction or waiver on or prior to the Closing Date of all of the following conditions.

7.1 Representations and Warranties; Performance of Obligations. All the representations and warranties of the Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date; all of the terms, covenants and conditions of this Agreement to be complied with or performed by the Seller on or before the Closing Date shall have been duly performed or complied with in all material respects; and the Seller shall have delivered to the Buyer a certificate dated the Closing Date and signed by the President and Chief Financial Officer of the Seller to such effect in form annexed hereto as Annex IX.

7.2 No Material Adverse Effect. No event or circumstance shall have occurred with respect to the Seller which would constitute a Material Adverse Effect, and the Seller shall not have suffered any loss or damages to any of its properties or assets, whether or not covered by insurance, which change, loss or damage could affect or impair the ability of the Buyer after the Closing to conduct the Business.

7.3 Opinion of Counsel. The Buyer shall have received an opinion signed by counsel the Seller, dated the Closing Date, in the form annexed hereto as Annex X.

7.4 Consents and Approvals; No Restraint. All necessary consents of and filings with any governmental authority or agency relating to the consummation of the transactions contemplated herein shall have been obtained and made; except for the agreements listed on Schedule 3.19, all required consents and approvals of third parties to the transactions contemplated by this Agreement shall have been obtained; and no action or proceeding shall have been instituted by any governmental authority or agency or third party to restrain or prohibit the purchase of the Assets contemplated hereby.

7.5 Instruments of Conveyance. The Seller shall have executed, acknowledged and delivered to the Buyer a Bill of Sale in the form annexed hereto as Annex XI and all such other instruments which Buyer and its legal counsel reasonably deem necessary or appropriate to vest in the Buyer title to the Assets or further evidence the Buyer's title thereto.

7.6 Seller's Incumbency Certificate. The Buyer shall have received an incumbency certificate, in form annexed hereto as Annex XII, dated the Closing Date, signed by the Secretary or Assistant Secretary of the Seller.

7.7 Seller's Authorizing Resolutions. The Buyer shall have received a certificate, in form annexed hereto as Annex XIII, dated the Closing Date, signed by the Secretary or Assistant Secretary of the Seller.

7.8 Inman Agreement. The Seller shall have delivered to the Buyer an agreement, in form annexed hereto as Annex V, dated the Closing Date, executed by Joel Douglas Inman.

7.9 Biggers Agreement. The Seller shall have delivered to the Buyer an agreement, in form annexed hereto as Annex VI, dated the Closing Date, executed by Keith D. Biggers.

7.10 Employment Agreements. The Seller shall have delivered to the Buyer agreements, in the forms annexed hereto as Annex VIII, dated the Closing Date, executed, as applicable, by each other party thereto as listed on Schedule 6.9.

7.11 Agreements Relating to Trade Secrets and Confidential Information. The Seller shall have delivered to the Buyer agreements, in form annexed hereto as Annex XIV, dated the Closing Date, executed by each person listed on Schedule 6.10 that accepts the Seller's offer of employment.

7.12 Amended and Restated Agreement. The Seller shall have delivered to the Buyer an agreement, in form annexed hereto as Annex XV, dated the Closing Date, executed by Robert D. Kugel, M.D. amending and restating the instrument between the Seller and Robert D. Kugel, M.D. dated March 19, 1999 entitled ASSIGNMENT AND AGREEMENT.

7.13 Termination of Consulting Agreement. The Seller shall have delivered to the Buyer an agreement, in form annexed hereto as Annex XVI, dated the Closing Date, executed by

Seller and Robert D. Kugel, M.D. terminating the consulting agreement dated March 19, 1996 between the Seller and Robert D. Kugel, M.D.

7.14 Dr. Reddick Agreement. The Seller shall have delivered to the Buyer an agreement, in form annexed hereto as Annex XVII, dated the Closing Date, executed by Eddie Joe Reddick, M.D.

7.15 Dr. Kugel Agreement. The Seller shall have delivered to Buyer an agreement, in form annexed hereto as Annex XVIII, dated the Closing Date, executed by Robert D. Kugel, M.D.

7.16 Trademark Assignment. The Seller shall have executed and delivered to the Buyer a trademark assignment, in form annexed as Annex XIX, dated the Closing Date.

7.17 Patent Assignments. The Seller shall have executed and delivered to the Buyer patent assignments, in form annexed hereto as Annex XX, dated the Closing Date.

7.18 Domain Name Assignments. The Seller shall executed and delivered to the Buyer a domain name assignment, in form annexed hereto as Annex XXI, dated the Closing Date.

7.19 Escrow Agreement. The Seller shall have executed and delivered to Buyer an escrow agreement, in form annexed hereto as Annex XXII, dated the Closing Date.

7.20 Change of Name. The Seller shall have changed its name to a name having no similarity to Surgical Sense.

7.21 Payment of Debt. The Seller shall have provided evidence satisfactory to the Buyer that the Seller's indebtedness to Joel Douglas Inman and Dr. William Saye has been paid in full.

7.22 Manufacturing and Supply Agreements. The Seller shall have furnished to the Buyer documents in form satisfactory to the Buyer evidencing: (i) termination of all agreements and understandings between the Seller and each of Prodesco, Inc. Surgical Technologies, Inc., Biogeneral, Inc. and Resonetics Micromachining Technology, and (ii) termination of all agreements and undertakings between the Seller and Atrium Medical Corporation, except for the purchase orders attached hereto as Schedule 7.22.

7.23 Continuing Relationship. Except for Atrium Medical Corporation, the entities listed on Schedule 7.23 shall have furnished the Buyer with written confirmation, in form reasonably satisfactory to the Buyer, confirming that, for a period of not less than six (6) months following the Closing Date, they will provide the Buyer with the same items and/or services as provided to the Seller prior to the Closing Date on the same financial terms as provided to the Seller.

8. POST-CLOSING COVENANTS

8.1 Further Assurances. From time to time after the Closing, at the request of the Buyer and without further consideration, the Seller shall execute and deliver any further

struments and take such other action as may be reasonably requested by the Buyer to vest or confirm title to the Assets or otherwise carry out the transactions contemplated hereby.

8.2 Employment Matters. Buyer hereby covenants that:

(i) Each of the Seller's employees who accepts employment with the Buyer on the Closing Date: (a) will be provided with medical, dental, life and disability insurance, 401(k) benefits and other indemnity plans comparable to those made available to the Buyer's other employees holding a comparable position, (b) will receive credit for time served in the employ of the Seller for purposes of any qualification for or vesting of the benefits itemized in clause (a), and (c) will receive credit for any deductibles, co-payments or similar payments made, in the year in which the Closing occurs, under the health plan of the Seller.

(ii) If a person listed on Schedule 6.10 accepts employment with the Buyer on the Closing Date or if any other former employee of the Seller signs an employment agreement with the Buyer on the Closing Date, and such person is terminated by the Buyer without "cause" the following shall apply: (x) if such termination occurs within six (6) months after the Closing Date such person shall be entitled to receive from the Buyer severance equal to ninety (90) days base salary and (y) if such termination occurs thereafter such person shall be entitled to receive from the Buyer severance payments in accordance with the Buyer's then existing severance policies. For purposes of this Section 8.2(ii), "cause" means: (a) the determination by the Buyer that the employee has failed to perform the essential responsibilities of the employee's position, (b) the determination by the Buyer that the employee has engaged in conduct that is injurious or detrimental to the best interests of the Buyer or its affiliate(s), or (c) conviction of the employee of a felony or conviction of the employee of a misdemeanor involving an act or moral turpitude.

8.3 Retention of Purchase Price. Until the final determination of the Purchase Price pursuant to Section 1.3, the Seller will retain at least $250,000 of the Purchase Price and will not make any distribution to its stockholders such that after giving effect thereto the Seller has less than such sum available in cash.

## 9. INDEMNIFICATION

The Seller and the Buyer each make the following covenants that are applicable to them, respectively:

9.1 Survival of Representations and Warranties of the Seller.

(i) The representations and warranties of the Seller made in this Agreement and in the documents and certificates delivered in connection herewith (other than the representations and warranties in Sections 3.2, 3.18 and 13.6 and the provisions of any representations and warranties relating to title to assets) shall survive the purchase of the Assets contemplated hereby for a period of one year from the Closing Date, provided, however, that all representations and warranties with

respect to which a claim is made within such one-year period shall survive until such claim is finally determined and paid. The representations and warranties of the Seller in Section 3.18 shall survive for the applicable statute of limitations and the representations and warranties of the Seller in Sections 3.2 and 13.6 and the provisions of any representations and warranties relating to title to assets shall survive indefinitely.

(ii) The representations and warranties of the Buyer made in this Agreement and in the certificates delivered in connection herewith shall survive the purchase of the Assets contemplated hereby for a period of one year following the Closing Date, provided, however, that representations and warranties with respect to which a claim is made within such one-year period shall survive until such claim is finally determined and paid.

(iii) The date on which a particular representation or warranty expires as provided herein is herein called the "Expiration Date." No claim for indemnification may be made with respect to a representation or warranty after its Expiration Date.

(iv) Nothing herein shall adversely affect the period of time in which a party may make a claim based on fraud.

9.2 Indemnification by the Seller. The Seller covenants and agrees that it will indemnify, defend, protect, and hold harmless the Buyer and its affiliates and their respective officers, directors, employees, stockholders, agents and representatives (the "Buyer's Indemnified Parties") from and against all claims, damages actions, suits, proceedings, demands, assessments, adjustments, costs and expenses (including specifically, but without limitation, reasonable attorneys' fees and expenses of investigation) (collectively "Damages") incurred by Buyer's Indemnified Parties as a result of or incident to (i) any representation or warranty of the Seller set forth herein or in the certificates or other documents delivered in connection herewith being untrue in any respect, provided a claim for such breach is made against the Seller by the Buyer prior to the applicable Expiration Date, (ii) any breach or nonfulfillment of any covenant or agreement by the Seller under this Agreement; (iii) any liabilities of the Business not assumed by the Buyer including any liabilities to any of the Seller's employees to whom offers of employment were made pursuant to this Agreement but who did not accept such offers; and (iv) the operation of the Business prior to the Closing Date, except for the Assumed Liabilities.

9.3 Indemnification by the Buyer. The Buyer covenants and agrees that it will indemnify, defend, protect and hold harmless the Seller and its employees, agents, representatives and affiliates (the "Seller's Indemnified Parties") from and against all Damages incurred by the Seller's Indemnified Parties as a result of (i) any representation or warranty of the Buyer set forth herein or in the certificates or other documents delivered in connection herewith being untrue in any respect, provided a claim for such breach is made against the Buyer by the Seller prior to the applicable Expiration Date; (ii) any breach or nonfulfillment of any covenant or agreement by the Buyer under this Agreement, and (iii) any liabilities resulting from the operation of the Business after the Closing except to the extent such liability results from a breach by Seller of its representation, warranties or covenants hereunder.

9.4 Third Person Claims. Promptly after any party hereto (the "Indemnified Party") shall receive notice of or has knowledge of any claim by a person not a party to this Agreement ("Third Person") of the commencement of any action or proceeding by a Third Person that may give rise to a right of indemnification hereunder, such Indemnified Party shall give to the party obligated to provide indemnification hereunder (an "Indemnifying Party") written notice of such claim or the commencement of such action or proceeding; provided, however, that the failure to give such notice will not relieve such Indemnifying Party from liability under this Section with respect to such claim, action or proceeding, except to the extent that the Indemnifying Party has been actually prejudiced as a result of such failure. The Indemnifying Party (at its own expense) shall have the right and shall be given the opportunity to associate with the Indemnified Party in the defense of such claim, suit or proceedings, provided that counsel for the Indemnified Party shall act as lead counsel in all matters pertaining to the defense or settlement of such claims, suit or proceedings. The Indemnified Party shall not, except at its own cost, make any settlement with respect to any such claim, suit or proceeding without the prior consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed. It is understood and agreed that in situations where failure of the Indemnified Party to settle a claim expeditiously could have an adverse effect on the Indemnified Party, the failure of the Indemnifying Party to act upon the Indemnified Party's request for consent to such settlement within ten business days of the Indemnifying Party's receipt of notice thereof from the Indemnified Party shall be deemed to constitute consent by the Indemnifying Party of such settlement for purposes of this Section 9.

9.5 Escrow; Buyer's Right of Set-Off. From time to time, in accordance with the terms of the escrow agreement referred to in Section 7.19 and as more specifically described therein, the Buyer may give written notice (the "Notice") to the Seller and the escrow agent named therein (the "Escrow Agent") of a claim for indemnification under this Section 9, specifying in reasonable detail the nature and dollar amount of such claim. If the Seller fails to dispute such claim within thirty days following receipt of the Notice, the Escrow Agent may pay the amount of Damages claimed by Buyer in the Notice from the Holdback Amount as provided in the Escrow Agreement. Any such payment shall be without prejudice to the rights of either party with respect to the underlying claim for indemnfication.

9.6 Arbitration. Any dispute, claim or controversy arising between the parties hereto arising out of or relating to any of the terms of this Agreement or the breach thereof, the determination of which is not otherwise provided for by this Agreement, shall be submitted for final and binding arbitration to a single arbitrator in New York City in accordance with the rules then obtaining of the American Arbitration Association (or any organization successor thereto) (the "AAA") and in accordance with the Civil Practice law and Rules of the State of New York applicable thereto. In any arbitration, all services and notices shall be deemed sufficiently served on the respective parties hereto if sent by certified or registered mail to the address of the parties set forth in Section 13.8 of this Agreement as such address may be changed from time to time by notice given pursuant to such Section or in such other manner of service as is permitted under applicable rules. Any award or decision made by the arbitrator shall be conclusive in the absence of fraud, and judgment upon said award or decision may be entered in any court having jurisdiction hereof. The arbitrator shall be directed to apply the laws of the State of Texas in resolving the arbitration. The arbitrator shall be a person satisfactory to the Seller and the Buyer, or if the Seller and the Buyer cannot agree on an arbitrator within 30 days after the date a party

demands arbitration hereunder, either party may request the AAA to appoint the arbitrator, or if the AAA shall not appoint the arbitrator within 30 days after being requested to do so, either party may apply for a court appointment of the arbitrator. All fees, costs and expenses of the arbitration (including reasonable attorneys' fees and witness fees of the prevailing party in any such arbitration) shall be borne by the party who does not prevail. Notwithstanding the foregoing, in the case of any arbitration pursuant to Section 1.3 hereof, the arbitrator shall be a member of a nationally-recognized accounting firm, who shall agree to provide a written opinion with respect to the specific results of the arbitration, and who shall be either (a) an independent certified accountant, satisfactory to the Seller and the Buyer and having no recent or on-going relationships with the Seller or the Buyer or (b) if the Seller and the Buyer cannot agree on such an accountant, a person selected by the American Institute of Certified Public Accountants ("AICPA"), who has knowledge of the medical devices industry, for final and binding resolution of such disagreements. In the event the arbitrator renders a decision agreeing with the Buyer's determination of the Net Book Value of the Business on the Closing Date, all out of pocket fees, costs and expenses of the arbitration (as well as Buyer's reasonable attorneys' fees and witness fees) shall be borne by the Seller. In the event such arbitrator renders a decision agreeing with the Seller's determination of the Net Book Value of the Business on the Closing Date, all out of pocket fees, costs and expenses of the arbitration (as well as Seller's reasonable attorneys' fees and witness fees) shall be borne by the Buyer. If the decision of the arbitrator agrees partially with the Seller and partially with the Buyer, each party shall bear its owns costs incurred in connection with the arbitration and the costs of the arbitrator will be allocated equitably between the Buyer and the Seller as the arbitrator may determine.

9.7 Limitations on Indemnification.

(i) Except as provided in clause (ii) below, an Indemnified Party shall not assert any claim for indemnification hereunder against an Indemnifying Party with respect to breaches of representations and warranties until such time as the aggregate of all claims which such Indemnified Party may have against such Indemnifying Party shall exceed $250,000, and then only to the extent of such excess. Notwithstanding the foregoing, there is no minimum applicable to any claim for breach of the representations and warranties in Sections 3.2, 3.18 and 13.6. The Seller's Indemnified Parties shall only be required to indemnify the Buyer's Indemnified Parties up to an aggregate amount equal to 50% of the Purchase Price;

(ii) Anything to the contrary herein notwithstanding the Seller shall indemnify the Buyer without limit as to amount or time of claim for all damages attributable to claims by any third parties with whom the Seller, or any representative thereof discussed the possible sale of the Business.

(iii) No Indemnified Party shall be entitled to recover more than once for any Damages that (a) result from the breach of more than one representation, warranty or covenant and (b) arise from the same event or circumstance;

(iv) The rights of each Indemnified Party under this Section 9 are the sole and exclusive rights and remedies of such Indemnified Party for the inaccuracy or

breach of any representation or warranty of any Indemnifying Party contained herein or in any certificate or Schedule furnished in connection herewith, or the failure of the Indemnifying Party to perform any agreement, covenant or undertaking required by the terms of this Agreement to be performed by such Indemnifying Party, absent fraud

(v) No person shall be entitled to indemnification under this Section 9 if and to the extent that such person's claim for indemnification is directly or indirectly caused by a breach by such person of any representation, warranty, covenant or other agreement set forth in this Agreement.

9.8 Method of Payment. All claims for indemnification shall be paid in cash.

## TERMINATION OF AGREEMENT

10.1 Termination. This Agreement may be terminated at any time prior to the Closing Date solely:

(i) by mutual consent of the Buyer and Seller;

(ii) by either the Buyer or Seller, if the transactions contemplated by this Agreement to take place at the Closing shall not have been consummated by January 31, 2000 (the "Termination Date"), unless the failure of such transactions to be consummated is due to the willful failure of the party seeking to terminate this Agreement to perform any of its obligations under this Agreement to the extent required to be performed by it prior to or on the Closing Date; or

(iii) by the Buyer on the one hand, or by the Seller on the other hand, if a material breach or default shall be made by the other party in the observance or in the due and timely performance of any of the covenants or agreements contained herein, and the curing of such default shall not have been made on or before the Termination Date.

10.2 Liabilities in Event of Termination. The termination of this Agreement will in no way limit any obligation or liability of any party based on or arising from a breach or default by such party with respect to any of its representations, warranties, covenants or agreements contained in this Agreement including, but not limited to, legal and audit costs and out of pocket expenses. In addition, all non-disclosure and confidentiality obligations of the parties shall survive the termination of this Agreement.

## NONCOMPETITION

11.1 Prohibited Activities. The Seller will not, for a period of five years following the Closing Date, for any reason whatsoever, directly or indirectly, for themselves or on behalf of or in conjunction with any other person, persons, company, partnership, corporation or business of whatever nature:

(i) engage, as a shareholder, owner, partner, joint venture or in any other capacity, except as otherwise provided herein, in any business involved in the design, manufacture, marketing or sale of hernia repair products ("Hernia Products") in competition with the Buyer or any of its affiliates within the United States of America and any foreign jurisdiction in which the Buyer or any of its affiliates are, directly or indirectly, from time to time conducting business relating to Hernia Products (the "Territory");

(ii) solicit or hire any employee or consultant of Seller who becomes an employee or consultant of the Buyer or any of its affiliates as of the Closing, while he or she is employed or retained as a consultant by Buyer or any affiliate of Buyer or within the 12-month period following any termination of employment or consultancy with Buyer or any affiliate of Buyer, for the purpose or with the intent of offering employment to such employee or consultant provided that the consent of the Buyer to such hiring will not be unreasonably withheld in the case of an employee who is terminated by the Buyer or leaves by mutual consent; or

(iii) solicit any person or entity which is, or has been prior to the Closing Date, a customer or supplier of the Seller for the purpose of selling Hernia Products in competition with the Buyer or any of its affiliates.

Notwithstanding the above, the foregoing covenant shall not be deemed to prohibit the Seller from acquiring as a passive investor with no involvement in the operations or management of the business, not more than five percent of the capital stock of a competing business whose stock is publicly traded on a national securities exchange or over-the-counter market.

11.2 <u>Equitable Relief</u>. Because of the difficulty of measuring economic losses to the Buyer as a result of a breach of the covenant set forth in Section 11.1, and because of the immediate and irreparable damage that could be caused to the Buyer for which it would have no other adequate remedy, the Seller agrees that the covenant set forth in Section 11.1 may be enforced by the Buyer or its affiliates in the event of breach by the Seller by injunctions, restraining orders and other equitable actions. As used in this Agreement with respect to the Buyer, "affiliates" includes C.R. Bard, Inc. and any person, firm or entity controlled by, controlling or under common control with C.R. Bard, Inc.

11.3 <u>Reasonable Restraint</u>. It is agreed by the parties hereto that the foregoing covenants in this Section 11 impose a reasonable restraint on the Seller in light of the activities and business of the Buyer and its affiliates on the date of the execution of this Agreement and the current plans of the Buyer.

11.4 <u>Severability; Reformation</u>. The covenants in this Section 11 are severable and separate, and the unenforceability of any specific covenant shall not affect the provisions of any other covenant. Moreover, in the event any court of competent jurisdiction shall determine that the scope, time or territorial restrictions set forth are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent which the court deems reasonable, and the Agreement shall thereby be reformed.

**NONDISCLOSURE OF CONFIDENTIAL INFORMATION**

12.1 General. Both the Buyer and Seller recognize and acknowledge that they had in the past, currently have, and in the future may possibly have, access to certain confidential information of the other, such as operational policies, pricing and cost policies, and other information, that are valuable, special and unique assets of such other party. The Buyer and Seller agree that, unless disclosure is required by law or order of any governmental authority under color of law, they will not disclose such confidential information to any person, firm, corporation, association or other entity for any purpose or reason whatsoever, except (a) to authorized representatives of the other party and (b) to counsel and other advisers, provided that such advisers (other than counsel) agree to the confidentiality provisions of this Section 12.1. Prior to disclosing any information required by law or order, the party that has been entrusted with the other's confidential information shall, if possible, give prior written notice thereof to the other and provide such other party with the opportunity to contest such disclosure. The foregoing obligation of confidentiality shall not apply to information that (i) at the time of disclosure, is in, or subsequently becomes part of, the public domain by any means other than the receiving party's breach of its obligations hereunder, or (ii) was known to the receiving party at the time of disclosure as evidenced by the receiving party's business records maintained in the ordinary course of business, or (iii) is, at any time, disclosed to the receiving party by any third party who is under no obligation to the disclosing party to maintain the same in confidence, or (iv) is developed by an employee(s) of the receiving party who is shown by competent proof and by clear and convincing evidence not to have been privy to any confidential information disclosed by the disclosing party under this Agreement. Without the prior written consent of the other party, neither party to this Agreement will disclose or authorize disclosure of the execution and delivery or the terms and conditions of this Agreement, except: (i) Seller may disclose such terms to its stockholders in connection with the solicitation of their consent to the transactions contemplated by this Agreement, (ii) the parties may disclose terms of this Agreement as they deem reasonably necessary to enforce their rights under this Agreement and (iii) if such disclosure is required by law or order, and then only after giving as much prior notice to the other party as is practical under the circumstances. In the event of a breach or threatened breach of the provisions of this Section 12.1, the non-breaching party shall be entitled to injunctive or other equitable relief restraining the other party from disclosing, in whole or in part, such confidential information. Nothing herein shall be construed as prohibiting the non-breaching party from pursuing any other available remedy for such breach or threatened breach, including the recovery of damages.

12.2 Equitable Relief. Because of the difficulty of measuring economic losses as a result of the breach of the foregoing covenants, and because of the immediate and irreparable damage that would be caused for which the Buyer or Seller, as the case may be, would have no other adequate remedy, the Buyer and Seller agree that the foregoing covenants may be enforced against them by injunctions, restraining orders and other appropriate equitable relief.

12.3 Survival. The obligations of the parties under this Section 12 shall survive the termination of this Agreement for a period of five years.

## Schedule 1.4
## Assumed Agreements

**Contracts**

1. Lease Agreement between Seller and John Wasilchak d/b/a JW Management Company relating to Seller's business premises dated January 6, 1997, as amended by the addendum dated July 31, 1997, the Renewal of Lease Agreement dated November 17, 1997, the Addendum to the November 1997 Renewal dated March 5, 1998 and the Renewal of Lease dated November 5, 1998.

2. Self-Service Storage Rental Agreement with Northwest Addition, Ltd. dated October 15, 1997.

3. Equipment Lease Agreement with Sanwa Leasing Corporation dated October 23, 1998 (copier, fax, stand)

4. Pitney Bowes Software Maintenance and Data Subscription Agreement dated February 11, 1998.

5. Letter Agreement with Chicago Exhibit Productions, Inc. dated July 2, 1999.

6. Maintenance Agreement with Digitec Computer Services, Inc. dated November 13, 1998.

7. Oral agreements for international pricing of products with person listed on the attached (net 60 billing terms, generally a 40% discount from the U.S. list price, terminable upon notice)

Agreements between Seller and the stated parties described in Section 7.23 of this Agreement and in the Schedule referenced therein.

Agreement referenced in Section 7.12

**Purchase Orders:**

Purchase Orders delivered to Surgical Technologies, Inc. as attached to this Schedule.

Purchase Order delivered to Branson Ultrasonics Corporation as attached to this Schedule.

Purchase Order delivered to Resonetics Micromachining Technology as attached to this Schedule.

Purchase Order delivered to Simulab Corporation as attached to this Schedule.